# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF CONNECTICUT
# BRIDGEPORT DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CABLE READY CORPORATION | ) | Case No. 13-50970 (AHWS) |
|  | ) |  |
|  | ) |  |

## DISCLOSURE STATEMENT

Elizabeth J. Austin, Esq.
Jessica Grossarth, Esq.
Pullman & Comley, LLC
850 Main Street
Bridgeport, CT  06604
*Counsel to Cable Ready Corporation*

## I.    INTRODUCTION

### A.    The Disclosure Statement

The Debtor, Cable Ready Corporation ("Debtor") has proposed and filed its Plan of Liquidation dated November 25, 2013 (the "Plan") under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code").    The Debtor submits this Disclosure Statement dated November 25, 2013 (the "Disclosure Statement") pursuant to Section 1125 of the Code in connection with solicitation of acceptances or rejections of the Plan from, holders of claims and interests in the Debtor. A copy of the Plan is annexed hereto as **Exhibit "A."**[1] The Debtor is seeking confirmation of the Plan by the Court.

The hearing on confirmation of the Plan is scheduled for December __, 2013 at ____ a.m./p.m. By order of the Bankruptcy Court dated December __, 2013 this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtor in accordance with Section 1125(b) of the Code.    Approval of this Disclosure Statement by the Bankruptcy Court does not indicate that the Bankruptcy Court recommends either acceptance or rejection of the Plan.

Holders of Class 1 Claims (General Unsecured Claims) are impaired and should read this Disclosure Statement and the Plan in their entirety before voting.    Holders of Class 2 Interests (Equity) are impaired, will receive no distributions under the Plan and are deemed to have rejected the Plan pursuant to 11 U.S.C. § 1126(g).    No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and Section 1125 of the Bankruptcy Code.    You should not rely on any information relating to the Debtor, its estate or the Plan, other than that contained in this Disclosure Statement, the Plan and the documents

---

[1] All capitalized terms not expressly defined herein shall be given the meaning ascribed to them in the Plan.

provided with the Disclosure Statement and Plan. In making a decision to accept or reject the Plan, each claimant eligible to vote must rely on its own examination of the Debtor as described in the Disclosure Statement and terms of the Plan, and should consult with such legal, business, financing and tax advisors as to any such matters concerning the solicitation of votes to accept or reject the Plan.

If the requisite acceptances are received, the Plan is confirmed by the Bankruptcy Court, and the Effective Date occurs, all holders of the Claims or Interests (including those who do not submit ballots to accept or reject the Plan) will be bound by the Plan and the transactions contemplated by the Plan.

### B.    Overview of the Plan

THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY. CREDITORS ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, SEE III, "PLAN OF REORGANIZATION" BELOW, AND THE PLAN ITSELF, WHICH IS INCLUDED AS **EXHIBIT A** TO THIS DISCLOSURE STATEMENT. ALL SUMMARIES ARE QUALIFIED BY THE PLAN ITSELF. THE PLAN IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY BETWEEN A SUMMARY AND THE PLAN.

The Plan is a liquidating plan, and the following table summarizes the classification and treatment of Allowed Claims under the Plan:

| Claim and Estimated Amount of Claims in Class | Treatment Under the Plan |
|---|---|
| Administrative Claims | Paid from Estate Funds, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (i) as soon as reasonably practicable after the Effective Date or (ii) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim. |
| Class 1 – General Unsecured Claims | Holders of Class 1 Claims will receive their pro rata share of the Unsecured Claim Fund (after payment of Allowed Administrative Expenses and Priority Tax Claims, as required by the Plan, or adequate reserve therefore has been established).  On the Initial Distribution Date, the Holders of Allowed Class 1 Claims will receive distributions from the funds available in the Unsecured Claim Fund.  Thereafter, distributions of funds available in the Unsecured Claim Fund will be made quarterly to Holders of Allowed Class 1 Claims. Holders of Allowed Class 1 Claims who are Counterparties may, however, elect to participate in the Settlement Class described at Section IV. |
| Class  2 – Equity Interests | This Class consists of 100% interest held by Gary Lico in the Debtor.  Gary Lico's interest will be extinguished, and he will receive no distribution under the Plan and is deemed to have rejected the Plan pursuant to 11 U.S.C. § 1126(g). |

## C.    The Solicitation

On December __, 2013, after a hearing and notice, the Bankruptcy Court entered an

Order (the "Disclosure Statement Order") approving the Disclosure Statement as containing

adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable

investor, typical of the holders of Claims against the Debtor, to make an informal judgment whether to accept or reject the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OF COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for December 10, 2013 at __ a.m./p.m. (Eastern Time) before the Honorable Alan H.W. Shiff, United States Bankruptcy Judge, United States Bankruptcy Court, District of Connecticut, Bridgeport, Connecticut. The hearing may be adjourned from time-to-time without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing. Any objections to confirmation of the Plan must be in writing and filed with the Clerk of the Bankruptcy Court and served on the counsel listed below to ensure RECEIPT by them on or before December, 2013. Counsel on whom objections must be served are:

Pullman & Comley, LLC
850 Main Street
Bridgeport, CT 06604
Attn: Elizabeth J. Austin, Esq.
***Counsel to the Debtor***

### D.    Voting Instructions

1.    Ballots

In voting for or against the Plan, please use only the ballot or ballots sent to you with this Disclosure Statement. If you have an impaired claim in more than one Class under the Plan, you will receive multiple ballots. IF YOU RECEIVE MORE THAN ONE BALLOT, YOU

SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM OR INTEREST AND YOU SHOULD COMPLETE AND RETURN ALL OF THEM.

IF YOU ARE A MEMBER OF A VOTING CLASS AND DID NOT RECEIVE A BALLOT, IF YOUR BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, CALL ELIZABETH J. AUSTIN, PULLMAN & COMLEY, LLC AT (203) 330-2243 or VIA E-MAIL at eaustin@pullcom.com.

2.    Returning Ballots

Ballots are to be sent to counsel for the Debtor at the following address:

Pullman & Comley, LLC
850 Main Street
Bridgeport, CT 06604
Attn: Elizabeth J. Austin, Esq.

**IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED ON OR BEFORE DECEMBER, 2013.**

### *E.* **Acceptance or Rejection of the Plan**

As a creditor of the Debtor, your vote on the Plan is most important. In order for the Plan to be accepted by Creditors, votes representing at least two-thirds (2/3) in amount and more than one-half (1/2) in number of claims allowed for voting purposes of each impaired class that are voted must be received for the acceptance of the Plan. The Debtor is soliciting acceptances from members of the following Classes of Claims: Class 1 (Holders of General Unsecured Claims).

Class 2 (Equity Interests) is comprised of Gary Lico's 100% interest in the Debtor. Gary Lico's interest will be extinguished, and he will receive no distribution under the Plan and is deemed to have rejected the Plan pursuant to 11 U.S.C. § 1126(g).

**TO BE COUNTED, YOUR PROPERLY FILLED OUT AND EXECUTED BALLOT MUST BE RECEIVED BY COUNSEL FOR _____ BY 5:00 P.M.**

EASTERN STANDARD TIME ON _____, 2013, UNLESS THIS SOLICITATION IS EXTENDED BY ORDER OF THE BANKRUPTCY COURT. BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED. IT IS OF THE UTMOST IMPORTANCE THAT YOU VOTE PROMPTLY TO ACCEPT OR REJECT THE PLAN AFTER CAREFULLY REVIEWING THE PLAN AND THIS DISCLOSURE STATEMENT.

If you wish to change or withdraw your vote after submission of a ballot, Federal Rule of Bankruptcy Procedure 3018(a) requires that you provide notice and show cause at a hearing before the Bankruptcy Court.

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code section 1129 have been met. The Plan Proponents believe that the Plan meets the applicable requirements of Bankruptcy Code section 1125 (other than those pertaining to vote, which has not yet taken place) and will seek a ruling of the Bankruptcy Court to this effect at the hearing on confirmation of the Plan.

ALL PROJECTED RECOVERIES ARE MERELY ESTIMATES, BASED ON ASSUMPTIONS WHICH ARE SET FORTH IN THIS DISCLOSURE STATEMENT. TO THE EXTENT THAT ACTUAL RESULTS VARY FROM THE ASSUMPTIONS, RECOVERIES MAY VARY FROM THE ESTIMATES.

THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, AND CREDITORS ARE URGED TO VOTE TO ACCEPT THE PLAN.

## II.    THE DEBTOR AND THE CHAPTER 11 CASE

### A.    *The Debtor*

The Debtor sells programs from the world's most talented television producers to leading television networks around the globe, and the Debtor also represents a portfolio of noted producers, content owners, studios and cable networks. It has over 20 years of experience finding buyers for its producers' programs and maximizing the exposure and revenue their work receives. The programs are sold to Media Outlets including but not limited to A & E, History, Bravo, Discovery, TLC, Travel Channel, HGTV, Cooking Channel, Food Network, Animal Planet, Discovery Health, and TruTV. Around the world, Cable Ready's clients include Fox, NBC, AETN, NHK, UKTV, Zone CBS, Sky, Foxtel, TV4, Kanal 9, RTL, VOX, Planete, Orange, and hundreds of major broadcasters in over 130 countries around the world.

In essence, the Debtor enters into Distribution Agreements with Producers which allows the Debtor to distribute the Producers' programs in North America, and in some instances, around the world. The Debtor then arranges for the license of the Producers' programs from the Producers to Media Outlets by virtue of License Agreements.

The Debtor also develops programs and provides consulting services to enhance existing program ideas, to strategically match network needs with producer talents, to license existing library programs and program formats and to assist with input on all presentation tapes and pilots. The Debtor's marketing services include a highly trafficked, state-of-the-art website with full episode screening room, quarterly newsletters sent to thousands of buyers, working with a global TV/entertainment public relations agency, engaging in complete deal negotiation and contract preparation, and designing and engaging in delivery of print and digital advertising in key industry publications.

Due to industry consolidation, mergers and acquisitions of production companies, larger competitors paying exorbitant prices for programming, the uncertain global economy squeezing small companies similar to that of the Debtor, the Debtor was left with no choice but to file for Chapter 11. Throughout these hurdles, the Debtor cut spending drastically including salaries and was able to maintain a high level of service and relationships with its suppliers and producers throughout the Chapter 11 case.

B.    *The Professionals*

On June 21, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. By order dated July 29, 2012, this Court approved Pullman & Comley, LLC's ("P&C") retention as counsel to the Debtor *nunc pro tunc* to June 21, 2013. By order dated July 18, 2013, the Court approved the Amended Application of McGladrey, LLP as accountants to the Debtor *nunc pro tunc* to June 21, 2013. By order dated July 30, 2013, this Court approved David Fox & Associates, Inc.'s retention as management and sales consultants to the Debtor *nunc pro tunc* to June 21, 2013. On July 5, 2013, the Court entered the Notice of Appointment of the Official Committee of Unsecured Creditors ("Committee"). By order dated August 20, 2013, the Court entered an order approving Zeisler & Zeisler, P.C. as counsel to the Committee. Also, by order dated August 20, 2013, the Court entered an order approving the application of Pavia & Harcourt, LLP as special counsel to the Debtor *nunc pro tunc* to June 21, 2013.

C.    *The Cash Collateral Orders*

As a result of negotiations with the Committee, the Bank and various individual creditors throughout the course of the case, nine (9) consensual cash collateral orders were entered. Since the Petition Date, the Debtor and the Counterparties have disputed the nature of funds received by the Debtor in the post-Petition period. Counterparties assert that any payment, received by

the Debtor after the Petition Date that but for the filing would be due to a Counterparty as a commission relating to a Pre-Petition Distribution Agreement, is an administrative expense. It is the Debtor's position that any such monies collected post-Petition constitute property of the Estate and such Counterparty holds an unsecured claim for monies collected post-petition. To address the issue but avoid litigation during the case, the parties agreed to the following payment arrangements as evidenced by the Cash Collateral Orders: from July 31, 2013 through August 31, 2013, the Debtor escrowed 50% of the Producers' share of the receipts that were received by the Debtor in that period; from September 1, 2013 through September 21, 2013, the Debtor paid Producers 50% of the Producers' share of receipts that were received by the Debtor in that time period; from September 22, 2013 through either rejection of the Distribution Agreement or confirmation of the Plan, the Debtor agreed to pay Producers 100% of the Producers' share of receipts that were received by the Debtor in that time period. To address the issue to exit the Chapter 11 case, the parties agreed to the terms set forth below in Section IV.

      *D.*    *Sale Negotiations*

      Despite discussions with potential buyers and significant marketing of the company during the Chapter 11 process, a deal that made sense for the Creditors could not be struck. The Debtor believed that if a deal was not struck by mid-October, it did not make sense for either the Debtor or the Creditors to continue to operate while it waited for an offer, as even if it did come, it would not have been sufficient to make it beneficial for the creditors to allow the sale of the business, as opposed to liquidating. For that reason, the Debtor is proposing an orderly liquidation of the company.

      *E.*    *Committee's Challenge of the Bank's Secured Claim*

Connecticut Community Bank, N.A. d/b/a Norwalk Bank & Trust (the "Bank") extended

its financial accommodations to the Debtor with respect to which the Debtor was indebted to the Bank as of the Petition Date in the amount of $1,470,000. The Bank asserts that to secure such indebtedness that it holds a security interest and lien upon substantially all of the Debtor's property, including all accounts, money, cash and cash equivalents to secure the repayment of the indebtedness (the "Bank's Pre-Petition Liens"). The Committee asserts that the Bank's Pre-Petition Liens are avoidable. The Committee and the Bank have negotiated a resolution of the dispute in which the Bank, subject to confirmation of the Plan, will release the Bank's Pre-Petition liens. The Bank will be deemed to have an Allowed Unsecured Claim of $1,470,000 and the Bank will be permitted to apply the $30,135 of post-petition interest paid to the Bank pursuant to Cash Collateral Orders towards the amount due and owing to the Bank by the Debtor, provided however, that the application of these Funds shall not reduce the Bank's Allowed General Unsecured Claim of $1,470,000 for the purposes of calculating its pro rata distribution in Class 1 of the Plan.

## III.    THE LIQUIDATING PLAN

THE FOLLOWING DESCRIPTION OF THE PLAN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE INFORMATION SET FORTH IN THE PLAN, WHICH IS INCLUDED AS EXHIBIT "A" TO THIS DISCLOSURE STATEMENT.

### Unclassified Claims

*A.    Administrative Claims*

1.    Administrative Claims are not classified under the Plan and holders thereof shall not be entitled to vote to accept or reject the Plan.

a.    Payment of Administrative Claims

Each holder of an Allowed Administrative Claim shall receive from Estate Funds, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed

11

Administrative Claim either (i) as soon as reasonably practicable after the Effective Date or (ii) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.

        b.      U.S. Trustee Fees

In accordance with Section 1129(a)(12) of the Bankruptcy Code and 28 U.S.C. §1930, all quarterly fees payable to the U.S. Trustee shall be paid by the Debtor from Estate Funds in full on or before their respective due dates and shall continue to be assessed and paid until such time as a final decree closing, an order converting, or an order dismissing this case, is entered by the Court.

        c.      Professional Fee Claims

The Debtor or Debtor's professionals asserting a Professional Fee Claim for services rendered before the Effective Date must, unless previously filed, file and serve an application for final allowance of such Professional Fee Claim no later than the Administrative Claim Bar Date.

        d.      Administrative Claim Bar Date

The Bar Date for filing a request for payment of administrative expenses is 5:00 p.m. (EST) on the 30th day after the Effective Date for all entities, including governmental units and Professionals.  Each request for payment of an administrative expense, including any attachments, must be filed with the clerk of the United States Bankruptcy Court, District of Connecticut, 915 Lafayette Boulevard, Bridgeport, Connecticut 06604.  Failure to file a request for payment of administrative expense on or before the 30th day after the Effective Date will result in such claim being forever barred from receiving any distribution of cash or property from the Estate; provided, however, that any Counterparty seeking an Administrative Claim must

comply with the provisions of Article IV of the Plan to be eligible to assert an Administrative Claim.

        *B.*     *Allowed Priority Tax Claims*

Allowed Priority Tax Claims are not classified under the Plan, and holders thereof shall not be entitled to vote to accept or reject the Plan. Unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the Debtor, each holder of an Allowed Priority Tax Claim shall receive from the Debtor from Estate Funds, in full satisfaction of its Allowed Priority Tax Claim, payment, in full in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Claim plus interest at the applicable rate.

*C.*     *Payments Relating to Pre-Petition Distribution Agreements*

Counterparties assert that any payment received by the Debtor after the Petition Date that but for the filing would be due to a Counterparty as a commission relating to a Pre-Petition Distribution Agreement is an administrative expense. It is the Debtor's position that any such monies collected post-petition constitutes property of the Estate and such Counterparty holds an unsecured claim for monies collected post-petition. This issue is resolved pursuant to Article IV of the Plan. Please see Article IV for a description and explanation of the resolution.

*D.*     *Payments relating to Post-Petition Distribution Agreements*

One-Hundred percent (100%) of commissions due to Counterparties of Post-Petition Distribution Agreements will continue to be paid in accordance with such Post-Petition Distribution Agreements.

*E.*     *Settlement and Resolution of the Secured Claim of the Bank*

Upon the entry of the Confirmation Order, the following settlement with the Bank will be deemed to be approved pursuant to Bankruptcy Rule 9019. The Bank will execute the UCC-3 Termination Statement releasing all its liens, claims and encumbrances asserted against the

assets of the Debtor and the assets of the Estate. The Bank will be deemed to have an Allowed General Unsecured Claim of $1,470,000. The Bank will be permitted to apply the $30,135.00 of post-petition interest that was paid to the Bank pursuant to the Cash Collateral Orders, towards the amounts due and owing to the Bank by the Debtor, provided, however, that application of such funds shall not reduce the Bank's Allowed General Unsecured Claim of $1,470,000 for the purposes of calculating its Pro-Rata distribution in Class 1.

**Classified Claims**

All Allowed Claims and Equity Interests, except allowed Administrative and Priority Tax Claims, are placed in the following Classes for all purposes, including voting, Confirmation and distributions pursuant to the Plan. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of a different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

*Class 1 – Allowed General Unsecured Claims*

The Class 1 Claims approximate $4,600,00.00. Holders of Class 1 Claims will receive their pro rata share of the Unsecured Claim Fund (after payment of Allowed Administrative Expenses and Priority Tax Claims, as required by the Plan, or adequate reserve therefore has been established). On the Initial Distribution Date, the Holders of Allowed Class 1 Claims will receive distributions from the funds available in the Unsecured Claim Fund. Thereafter, distributions of funds available in the Unsecured Claim Fund will be made quarterly to Holders of Allowed Class 1 Claims.

Holders of Allowed Class 1 Claims who are Counterparties may, however, elect to participate in the Settlement Class described in Section IV below.

### Class 2 – Equity Interests

This Class consists of 100% interests held by Gary Lico in the Debtor. Gary Lico's interest will be extinguished, and he will receive no distribution under the Plan and is deemed to have rejected the Plan pursuant to 11 U.S.C. § 1126(g).

## IV.    SETTLEMENT CLASS

Counterparties holding Allowed Class 1 Claims may elect to Opt-In and participate in the Settlement Class. If such an option is made, in lieu of having its entire Claim being treated as an Unsecured Claim, such Counterparties will instead receive sixty (60%) of what they would otherwise be entitled to receive as a commission on receivables collected after the Petition Date provided, however, with the exception of the Tony Awards, such payment will be reduced by Allowable Expenses. If the Tony Awards elects to Opt-In, then in lieu of having its entire claim being treated as an Unsecured Claim, Tony Awards will instead receive 60% of what it would otherwise be entitled to receive as a commission on receivables collected after November 10, 2013 provided, however, such payment will be reduced by the Tony Awards Allowable Expenses. Such payments will be made through and including the earlier of the date that all Accounts Receivable have been collected with respect to a Distribution Agreement or twenty-one months after the Effective Date. If there are any remaining Accounts Receivable to be collected after the expiration of the 21 months, then the Counterparty to the Distribution Agreement, whose program has generated the receivable, will be assigned the right to pursue any uncollected receivable.

Attached hereto as **Exhibit "B"** is a report of amounts collected by the Debtor from the Petition Date through November 10, 2013, which Exhibit reflects the amount that the Debtor

expects Counterparties to be paid by virtue of such collections, as well as the amount that will be deemed to be waived by Counterparties. Attached hereto as **Exhibit "C"** is an analysis of Accounts Receivable anticipated to be collected from November 10, 2013 and thereafter reflecting the 60% that would be distributed to Counterparties and the 40% that would be deemed waived by Counterparties if such Counterparty elects to Opt-In.

If a Counterparty elects to participate in the Settlement Class, such Counterparty will be deemed to waive any claim against the Estate for the balance of the 40% commission and waive any litigation claims against the Estate on any theory that a Counterparty would be entitled to 100% of the commission provided for under the Distribution Agreement going forward or retroactively since the Petition Date.

The intent of the Plan is to ensure that all Counterparties, regardless of amounts paid or escrowed pursuant to the Cash Collateral Orders, are paid an equal percentage of their commission. Pursuant to the Cash Collateral Orders, certain Counterparties received distributions that were either more than 60% or less than 60%. To ensure that all Counterparties, regardless of the amounts paid or escrowed pursuant to the Cash Collateral Orders are paid an equal percentage of their commission, it will be necessary to do a true up. To true up the payments, the following procedures will be implemented. The monies held in the Escrow Fund, which amount equals 50% of the Producer Commission, such Counterparty will receive the 50% held in escrow plus an additional 10% of the Producer Commission provided for in such Counterparty's Pre-Petition Distribution Agreement. To the extent a Counterparty received 50% of the Producer Commission pursuant to the Fourth Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection, such Counterparty will be paid an additional 10% of its Producer Commission. If a Counterparty received 100% of the Producer Commission

pursuant to the Fifth Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection, the Estate will receive a credit of 40% of the amount paid which will be applied to payment of future commissions due such Counterparty pursuant to the Plan. If no further commissions are due to such Counterparty, then such credit will be applied to such Counterparty's pro rata share of any distribution it is entitled to receive as an Unsecured Creditor. Counterparties will not be entitled to assert a claim for the balance of unpaid commissions.

The Ballot provided with the Plan provides a mechanism by which a Counterparty can elect to Opt-In. To Opt-In, a Counterparty must select the Opt-In election on the Ballot.

Any Counterparty that elects to Opt-In is required to file an amended proof of claim on or before thirty (30) days after the Effective Date, limited to commissions collected by CRC pre-petition, but not paid as of the Petition Date. If any Counterparty that has elected to Opt-In fails to file an amended proof of claim on or before thirty (30) days after the Effective Date, then the amount of such Counterparty's claim will be based on the amount reflected in the books and records.

The Debtor and Committee reserve all rights to object to the amounts asserted in an amended proof of claim.

**ANY COUNTERPARTY THAT DOES NOT ELECT TO OPT-IN SHALL HAVE UNTIL THE DEADLINE SET BY THE BANKRUPTCY COURT TO OBJECT TO THE PLAN, TO OBJECT TO THE PAYMENT TO COUNTERPARTIES OF ONLY SIXTY PERCENT (60%) OF ITS COMMISSIONS ATTRIBUTABLE TO ACCOUNTS RECEIVABLE GENERATED PRE-PETITION AND COLLECTED POST-PETITION. FAILURE TO OBJECT BY THE PLAN CONFIRMATION DEADLINE WILL RESULT**

IN SUCH COUNTERPARTY BEING FOREVER BARRED FROM RAISING THAT OBJECTION AND ASSERTING AN ADMINISTRATIVE CLAIM.

V.     **MEANS OF IMPLEMENTATION OF THE PLAN**

  A.     *Funding*

The source of funding for the Plan shall consist of Cash on Hand, collection of Accounts Receivable, sale of the WBB Asset, the Waived Commissions, proceeds from Causes of Action and the sale of the Debtor's 25% interest in 100 East Avenue, LLC.

  B.     *Appointment of Plan Administrator*

  1.     Identity

Gary Lico and David Fox shall be deemed the Plan Administrator for the Debtor. The Plan Administrator shall assume it duties as of November 10, 2013, subject to such duties being terminated if a Confirmation Order does not enter on or before December 10, 2013.

  2.     Responsibilities of Plan Administrator

The responsibilities of the Plan Administrator shall include, but not be limited to, (i) collecting all Accounts Receivable; (ii) marketing WBB (specifically the Plan Administrators will have the right under the Plan to license WBB to a distributor selected by the Plan Administrator provided, however, such distributor and the sale price must be approved by the Oversight Person and such distributor will receive a commission of no more than 35%); (iii) marketing and selling CRC's 25% interest in 100 East Avenue, LLC, subject to Oversight Person approval; (iv) distributing all funds collected in the manner set forth herein; (v) establishing the Distribution Account; (vi) providing quarterly reports of all funds collected and distributed to the Oversight Person and other reports reasonably requested by the Oversight Person; (vii) implementing all distributions provided for under this Plan; (viii) overseeing the filing all required tax returns, and paying taxes and other obligations on behalf of the Debtor from Estate

18

funds; (ix) if directed by the Oversight Person, prosecuting or otherwise resolving Causes of Action, facilitating the prosecution of and settlement of, objections to, and estimation of claims, subject, however, to the approval of the Oversight Person; and (x) such other responsibilities as may be vested in the Plan Administrator pursuant to Bankruptcy Court order or as may be necessary or proper to carry out the provisions of the Plan.

The Plan Administrator will be required to post a bond in the amount of $750,000, and such bond shall be paid with the Estate Funds.

3.    Powers and Authority of Plan Administrator

The power and authority of the Plan Administrator shall, without any further Bankruptcy Court approval, include, without limitation, the following:  (i) make distributions in accordance with the Plan; (ii) subject to Oversight approval, invest Estate Funds and withdraw Estate Funds to make the distributions in accordance with the Plan; (iii) liquidating and converting the remaining assets of the Debtor to cash in accordance with the Plan; (v) pay taxes and other obligations owed by the Debtor from Estate Funds in accordance with the Plan; (vi) to engage employees or independent contractors, professional persons to assist the Plan Administrator with respect to its responsibilities, provided, however, such costs will be paid by the Plan Administrator from its Commission; (vii) paying Allowed amounts due any professionals employed by the Debtor or the Committee from Estate Funds; (viii) to interpret this Plan in the Plan Administrator's reasonable discretion subject to the input of the Oversight Person; and (ix) such other powers and authorities as may be vested in the Plan Administrator by the Bankruptcy Court or as may be necessary and proper to carry out the provisions of this Plan, except as expressly set forth herein.

4.    Retention of Professionals

The Plan Administrator may employ and compensate professionals, including counsel, consultants and financial advisors, as needed to assist in fulfilling its obligations under the Plan, subject to the approval of the Oversight Person. Subject to the approval of the Oversight Person, the Plan Administrator may employ professionals including, but not limited to those who were previously employed by the Debtor or Committee.

5.    Compensation

The Plan Administrator will be compensated as follows: (i) with respect to the collection of the Accounts Receivable, compensation will be paid on the sliding scale in the following manner:  7.5% of the Accounts Receivable until half of all Accounts Receivables have been collected; then 10% until three quarters of all Accounts Receivables have been collected; then 12.5% of the remaining Accounts Receivable; (ii) with respect to WBB, the Plan Administrator will receive 10% of the gross amount until an $250,000 is collected and paid into the Unsecured Claim Fund; then 15% until an additional $250,000 is collected and paid into the Unsecured Claim Fund; then 20% on all additional sales; and (iii) with respect to the interest in 100 East Avenue, LLC, the Plan Administrator will receive 6% of any proceeds from the sale of same.

All of the Plan Administrator's operating expenses which includes but is not limited to rent, utilities, bookkeeping staff, postage and copying costs will be paid by the Plan Administrator from the Plan Administrator's compensation and shall not be the responsibility of the Estate.

6.    Removal of Plan Administrator

Any creditor of the Estate or the Oversight Person has standing to seek an order from the Bankruptcy Court, after Notice of Hearing, to remove the Plan Administrator or any successor plan administrator appointed pursuant to the Plan for cause shown.

7.    Successor to the Plan Administrator

In the event the Plan Administrator is removed, resigns, or otherwise ceases to serve as Plan Administrator, the Oversight Person shall select a successor plan administrator within twenty (20) business days of the removal, resignation or cessation of service by the incumbent Plan Administrator. The Oversight Person shall file a notice of such successor, which shall be served upon all parties that have requested notice in the case. If the Oversight Person fails to act in accord with the provisions of this paragraph, any party-in-interest may file a motion for a successor plan administrator, which notice shall be served on all parties who requested notice in the case and subject to hearing and bankruptcy court approval. Any successor plan administrator shall be subject to the same qualifications and shall have the same rights, powers, duties and discretion and otherwise be in the same position as the originally named Plan Administrator. Wherever reference is made in this Plan to Plan Administrator, the same shall be deemed to refer to the Successor Plan Administrator acting hereunder. The Oversight Person may not be named as the Successor Plan Administrator.

8.    Termination

The duties, responsibilities and powers of the Plan Administrator shall terminate on the earlier of 24 months after the Effective Date or date all Accounts Receivable have been collected.

9.    Records

At the Plan Administrator's expense, the Plan Administrator shall maintain good and sufficient books and records of the Estate Funds, account relating to the assets of the Debtor's Estate, all post-confirmation transactions undertaken by the Plan Administrator, all expenses incurred by or on behalf of the Plan Administrator and after the Effective Date and all distributions contemplated or effectuated under the Plan.

C.    *Implementation*

The Plan Administrators shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, directing the Plan Administrators, any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect the transfers of property required by the Plan, including any notice of satisfaction, release or discharge of any lien, claim or encumbrance not expressly preserved in the Plan and any correction or other deed with respect to title, and to perform any act, including the satisfaction of any lien, that is necessary for the consummation of the Plan. Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

D.    *Payment of Fees and Expenses*

From the Effective Date until the entry of the Final Decree, all fees and expenses of the Debtor and the Committee and their agents, professionals and employees incurred in connection with all matters related to the Case and consummation and implementation of this Plan shall be paid from Estate Funds subject to Bankruptcy Court approval.

## VI.    **OVERSIGHT PERSON**

On or before the Confirmation Date, the Committee shall select a person to become the Oversight Person. The Oversight Person shall be the representative of all Holders of Allowed Unsecured Claims and Settlement Class Creditors, and shall oversee the post-Effective Date activities of the Plan Administrator in accordance with the Plan.

The powers and duties of the Oversight Person shall be limited to the following: (a) monitoring the activities of the Plan Administrator; (b) exercising reasonable discretion with

regard to the Plan Administrator duties that require Oversight Person approval; (c) determining which, if any, Causes of Action should be pursued by the Plan Administrator, and (d) participating in the removal of the Plan Administrator for cause and the appointment of any successor Plan Administrator.

The Oversight Person may retain counsel to represent the Oversight Person with respect to any claim or action asserted against the Oversight Person and to advise the Oversight Person on matters concerning the Causes of Action, and the Oversight Person's fiduciary duties. The reasonable and necessary expenses of the Oversight Person, including attorneys' fees and expenses, that may be incurred in the performance of the Oversight Person's fiduciary duties, shall be paid by the Plan Administrator from Estate Funds.

The Oversight Person shall not be liable to the Debtor, the Debtor's' creditors or any other Entity or party in interest for any error of judgment made in good faith, but only for gross negligence, willful misconduct, or fraud. The Oversight Person shall not be liable for any action taken or omitted in good faith and reasonably believed by them to be authorized within the discretion or rights or powers conferred upon him/her by the Plan. In performing his/her duties under the Plan, the Oversight Person may retain and consult with counsel selected by it, and shall have no liability for any reasonable action taken upon the advice of such counsel. None of the provisions of the Plan shall require or be construed as requiring the Oversight Person to expend or risk their own funds or otherwise incur or expose them to personal financial liability in the performance of any of his/her duties under the Plan or in the exercise of any of their rights and powers. The Oversight Person may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper person.

The Oversight Person will terminate upon completion of all payments and distributions to be made pursuant to the Plan.

## VII.   PROVISIONS GOVERNING DISTRIBUTIONS

### A.    *Collection and Segregation Process*

All Accounts Receivable collected on or after November 10, 2013 will be deposited into the Plan Escrow. To the extent the collections are attributable to a Pre-Petition Distribution Agreement, then 60% of the Producer Commission less Allowable Expenses will be paid to a Settlement Class Creditor within ten (10) business days of the receipt of the funds. The portion of the funds constituting Waived Commissions will be deposited into the Distribution Account. To the extent that the Accounts Receivable collected are attributable to a Post-Petition Distribution Agreement, then the amount of the commission due the Counterparty will be paid in accordance with the terms of such Post-Petition Distribution Agreement. The Debtor's Commission attributable to collection of Accounts Receivable shall be deposited into the Distribution Account. Thereafter, the funds in the Distribution fund less the Reserve and the Plan Administrator's commission, shall be deposited into the Unsecured Claim Fund.

All collections from the sale of WBB and 100 East Avenue, LLC will be deposited directly into the Plan Account and after calculation and payment of the Plan Administrator commission, remaining funds shall be deposited into the Distribution Account.

### B.    *Timing of Distributions Under the Plan*

Funds available in the Unsecured Claim Fund shall be paid to Holders of Allowed Unsecured Claims on the Initial Distribution Date continuing each and every quarter thereafter until the earlier of twenty-four (24) months after the Effective Date or the assets have been liquidated and/or Accounts Receivable collected.

C.    *Method of Payment*

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank.

D.    *Prosecution of Objections*

After the Confirmation Date, only the Plan Administrator shall have authority to file, settle, compromise, withdraw or litigate to judgment objections to any Claim, administrative Claim or Disputed Claim or Disputed Interest, subject to review and approval of the Oversight Person.

E.    *No Distribution Pending Allowance*

Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Disputed Claim are resolved by Final Order.

F.    *Deposit of Cash Distributions Related to Disputed Claims*

1.    Unless otherwise agreed to in writing by the Plan Administrator and the Holder of any Claim to which this section applies and exclusive of General Unsecured Claims, on the Effective Date the Plan Administrator shall reserve Cash equal to 100% of the Cash to be distributed on account of Disputed Claims that would be Allowed Claims but for the pendency of a dispute with respect thereto. Such Cash shall be held for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

2.    In determining the amount of Cash to be distributed under the Plan on account of Disputed Claims, the calculation of the distribution to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts.

3.      The Plan Administrator shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating or limiting the amount of Cash that must be so reserved.  Any Creditor whose Claims is so estimated shall have no recourse to any assets thereto distributed on account of any Allowed Claim, or any other Entity or property if the Allowed Claim of that Creditor as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims account (on a pro rated basis with other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims allowed by Final Order.

G.      *Distribution of Allowance*

Within ten (10) business days after the allowance of a Disputed Claim, in the event a Distribution has been made as of the date such claim becomes a Allowed Claim, the Plan Administrator shall distribute from the funds reserved in accordance with Article VII, Section E of the Plan, all Cash to which a Holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

H.      *Investment of Segregated Cash and Property*

To the extent practicable and subject to the approval of the Oversight Person, the Plan Administrator may invest any Cash segregated on account of any Disputed Claim, undeliverable distribution, or any proceeds thereof (i) in a manner that will yield a reasonable net return taking into account the safety of the investment, or (ii) in any manner permitted by section 345 of the Bankruptcy Code; provided, however, that the Plan Administrator shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash, or proceeds.

I.    *Distribution After Disallowance*

The Cash segregated on account of Disputed Claims, including the allocable portion of the net return yielded from any investment thereof remaining after all Disputed Claims have been resolved, shall be deposited into the Unsecured Claim Fund.

J.    *Delivery of Distributions*

Distributions to holders of Allowed Claims shall be made: (1) at the addresses set forth on the respective Proofs of Claim or Proofs of Interests filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the Plan Administrator after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules or if no Proof of Claim or Proof is filed and the Plan Administrator has not received a written notice of a change of address.

K.    *Undeliverable Distributions*

If any Distribution is returned to the Plan Administrator as undeliverable, no further distribution shall be made to the holder unless and until the Plan Administrator is notified in writing of such holder's then current address.  Undeliverable distributions shall remain in the possession of the Plan Administrator until the earlier of (i) such time as a distribution becomes deliverable or (ii) such undeliverable distribution becomes an unclaimed distribution pursuant to Article VII, Section L of the Plan, after which time, any undeliverable distribution shall be deposited into the Unsecured Claim Fund.

Nothing contained in the Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim or an Allowed Interest.

L.    *Unclaimed Distributions*

If Cash to be distributed under the Plan is not claimed by the Entity entitled thereto before the later of (i) one hundred and twenty (120) calendar days after the Distribution Date or

(ii) one hundred and twenty (120) calendar days after an Order allowing the Claim of the Entity becomes a Final Order, such Cash shall be deposited into the Unsecured Claim Fund.

    *M.*    *Set-offs*

The Plan Administrator may, but shall not be required to set-off against the Distributions to be made pursuant to the Plan, the claims, obligations, rights, Causes of Action and liabilities of any nature that the Debtor, or the Estate may hold against the Holder of an Allowed Claim, provided, however, that neither the failure to effect such a set-off nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Estate of any such claims, obligations, rights, causes of action and liabilities that the Debtor or Estate has or may have against such Holder.

    *N.*    *Diminimus Distributions*

No distribution of less than $10.00 shall be made to any Holder of a Claim.

## VIII. REJECTION AND ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

    *A.*    *Rejection of Pre-Petition Distribution Agreements*

The entry of the Confirmation Order shall constitute approval to reject all Pre-Petition Distribution Agreements. If a Counterparty to a Distribution Agreement has opted to participate in the Settlement Class, then such Counterparty's unsecured claim shall be limited to the amount provided in Article IV of the Plan. If a Counterparty to a Distribution Agreement did not elect to participate in the Settlement Class, then all Allowed amounts due such Counterparty shall be a General Unsecured Claim.

    *B.*    *Rejection of All Other Executory Contracts or Unexpired Leases*

The entry of the Confirmation Order shall constitute approval to reject any executory contract or unexpired lease, including the lease of nonresidential real estate between the Debtor

and 100 East Avenue, LLC, but other than the Pre-Petition Distribution Agreements, to the extent such Executory Contract or Unexpired Lease were valid and in effect as of the Petition Date of the Plan. The party to any such executory contract or unexpired lease shall file a proof of claim within thirty (30) days of the Effective Date or be forever barred from making a claim or receiving a distribution with respect to such claim. Allowed Claims for damages arising out of the rejection of any such Executory Contract or Unexpired Lease shall be General Unsecured Claims.

The Debtor does not consider a License Agreement to be an executory contract and nothing contained herein shall be construed to deem a License Agreement as rejected.

C.    *Termination of the MedStar Post-Petition Agreement*

The Debtor and Medstar agree that the Medstar Post-Petition Agreement will be deemed to be terminated as of the Effective Date. Notwithstanding any other provision in the Medstar Post-Petition Agreement, such termination will in no way impact the Plan Administrator's rights and obligations to collect and distribute on behalf of the Estate and Medstar, the commissions on the License Agreements listed below. Nor will such termination result in any claim, cost or other expense against the Estate: The License Agreement between the Debtor and Sci-Fi Channel Europe LLC dated September 13, 2013; the License Agreement between the Debtor and RTL Television GmbH dated September 27, 2013 (License No. L3894); the License Agreement between the Debtor and RTL Television GmbH dated September 27, 2013 (License No. L3895); the License Agreement between the Debtor and Sparrow Hawk International Channels Ltd. dated August 20, 2013; the License Agreement between the Debtor and Ureteam Medya H/ZMETLER/A.S. dated July 4, 2013; and the License Agreement between the Debtor and Zed dated August 18, 2013.

## IX.   RELEASES AND INJUNCTION

### *Injunction*

Except (i) as otherwise provided in the Plan or (ii) as otherwise provided under Final Order entered by the Bankruptcy Court, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin (i) the commencement or continuation of any action, the employment of process or any act to collect, enforce, attach, recover or offset from the Debtor or from property of the Debtor, (ii) the creation, perfection or enforcement of any lien or encumbrance against any property of the Debtor or any property distributed under the Plan, or (iii) any Claim or Interest discharged, released or satisfied under the Confirmation Order, the Plan or pursuant to section 1141(d)(1) of the Bankruptcy Code.

### *Limitation of Liability*

Neither the Debtor, nor any of its employees (acting in such capacity) nor any professional person employed by it, shall have incurred or will incur any liability to any Entity for any action taken or omitted to be taken in connection with or related to the formation, preparation, dissemination or Confirmation of the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with Chapter 11 Case or the Plan, except in the case of willful misconduct.

### *No Release of Plan Obligations*

Nothing in the Plan's Article XI shall operate to release any Person from the obligations expressly contemplated by the Plan.

*Plan and Confirmation Order as Release*

From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute and may be submitted as a complete defense to any claim or liability released pursuant to this Article XI of the Plan.

## X.    EXCULPATION

Each retained Professional of the Debtor or the Committee, and each member of the Committee, from and after the Effective Date, is hereby exculpated by all persons, Holders of Claims, entities, and parties-in-interest receiving distributions under the Plan, from any and all causes of action, liabilities or claims of any sort arising on or after the Petition Date out of or in connection with (a) the case or (b) the discharge of the powers and duties conferred upon such person by the Plan, or by any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan or applicable law, except solely for actions or omissions arising out of their respective gross negligence or exculpatory willful misconduct.    Holders of Claims, or representative thereof, shall not pursue any Claim, liability or cause of action (a) against the Plan Administrator for making payments in accordance with the Plan, or for implementing the provisions of the Plan, or (b) against any Holder of a Claim for receiving or retaining distributions or other payments as provided for in the Plan.

## XI.    MISCELLANEOUS PROVISIONS

*Termination of Cash Collateral Order Requirements*

As of November 10, 2013, the Debtor will no longer be required to make commission payments to any Counterparty provided for in the Cash Collateral Orders.    Thereafter, payments will be made by the Plan Administrator in accordance with the Plan.

31

*Dissolution and Discharge of the Committee*

Upon the Effective Date, the Committee will be deemed to be dissolved and discharged from its duties.

*Compliance with Tax Requirements*

In connection with the Plan, the Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities with respect to the Distributions; provided, however, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

*Due Authorization by Creditors*

Each and every Creditor who elects to participate in the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding liens, encumbrances, commitments, agreements or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

*Amendments*

The Plan may be altered, amended or modified by the Debtor, in writing, at any time before the substantial consummation of the Plan, as provided in sections 1101 (a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

*Revocation*

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or

release of any Claims by or against, or any interests in, the Debtor; or (ii) prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor.

### Filing of Additional Documents

Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### Section Headings

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

### Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor assign of such Entity.

### Severability

If any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or enforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose and intent of the term or provision held to be invalid, void or unenforceable, and such term or provisions shall then be applicable as altered or interpreted, unless the consequence of doing so shall materially adversely alter the rights or obligations of the Person affected by any such change, in which event the consent of such Person shall be required in order to confirm the

Plan. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial interpretation and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms, provided that consents, if any, required by the first sentence of this Article XII shall have been obtained.

### *Governing Law*

Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, and subject to the provisions of any contract, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Connecticut without giving effect to the principles of conflict of laws thereof.

### *Time*

In computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.

### *No Admissions*

Notwithstanding anything herein to the contrary, nothing contained in the Plan or the Disclosure Statement shall be deemed to be an admission by the Proponent with respect to any matter set forth herein, including any liability on or treatment of any Claim.

## XII.   ALTERNATIVES TO THE PLAN

The only known alternatives to the Debtor's Plan would be conversion of the case from a chapter 11 to a chapter 7 liquidation of the Debtor's assets by a trustee or an outright dismissal of the chapter 11 case .

In the event of a liquidation under chapter 7, the likelihood of the collection of the accounts receivable would be severely diminished and the ability to market WBB and obtain the benefit of its actual value would lost.  The value of the assets would be substantially diminished to a point where unsecured creditors would get substantially less than they are likely to receive through the Plan.

Alternatively, if the Plan is not confirmed under Bankruptcy Code §1129, the Debtor's case could be dismissed.  The Debtor believes that the dismissal of the chapter 11 case would result in piecemeal litigation and attachment of the Debtor's assets without bankruptcy court supervision.   Such litigation, would in the Debtor's opinion, generate substantially less for creditors than sums which we realized under the Plan and resulting in inequitable recoveries among creditors.

For the reasons described above, the Debtor believes that the distribution to each impaired class under the Plan would be greater and earlier than distributions that might be received after a liquidation of the Debtor by a chapter 7 trustee.

The Debtor believes that the confirmation of the Plan is preferable to the alternatives described above because the Plan provides for an equitable, early distribution to creditors.  Any alternative confirmation of Plan would result in significant delays and improbable diminution of recoveries.

## XIII.  CONFIRMATION HEARING

The Bankruptcy Code requires that the Bankruptcy Court, after notice, to hold a hearing on the confirmation of the Plan to consider whether the requirements of Section 1129 of the Bankruptcy Code have been met.  The confirmation hearing has been scheduled for **December __, 2013** at _____.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the confirmation hearing.  Any objection to confirmation must be made in writing and filed with the Bankruptcy Court and served upon the following on or before **December __, 2013:**

Elizabeth J. Austin, Esq.
Jessica Grossarth
Pullman & Comley, LLC
850 Main Street
Bridgeport, CT  06604
***Attorneys for the Debtor***

Holley Claiborn
Office of the United States Trustee
Giamo Federal Building
150 Court Street, Room 302
New Haven, CT  06510

Craig Lifland, Esq.
Zeisler & Zeisler
10 Middle Street
Bridgeport, CT  06604
***Attorney for the Committee***

## XIV.  RECOMMENDATION TO ACCEPT THE PLAN

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTOR BELIEVES THAT THE CONFIRMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.

## XV.    TAX CONSEQUENCES

The Debtor has not researched the federal tax income tax consequences of the Plan to Holders of Claims and Interests, based on the Internal Revenue Code. The Debtor has not requested a ruling from the Internal Revenue Service with respect to these matters. Accordingly, no assurance can be given as to the interpretation of the Internal Revenue Service. Further, the federal income tax consequences to any particular Creditor or Interest Holder may be affected by matters not discussed herein. There also may be state, local or foreign tax considerations applicable to each creditor or holder of an interest. **EACH CREDITOR AND HOLDER IN INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN AND THE FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.**

## XVI.    CONCLUSION

THE DEBTOR URGES ALL VOTING CLASS TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOT SO THAT THEY WILL BE RECEIVED BY DECEMBER __, 2013.

Dated at Bridgeport, Connecticut this 25th day of November, 2013.

                              Respectfully submitted,
                              PULLMAN & COMLEY, LLC.

                         By:  _/s/Elizabeth J. Austin_
                              Elizabeth J. Austin (ct04384)
                              Jessica Grossarth (ct23975)
                              Pullman & Comley, LLC
                              850 Main Street
                              Bridgeport, CT  06604
                              (203) 330-2243
                              eaustin@pullcom.com
                              jgrossarth@pullcom.com
                              ***Counsel to Cable Ready Corporation***

ACTIVE/76109.4/JXG/4350555v1