UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CABLE READY CORPORATION | ) Case No. 13-50970 (AHWS) |
| | ) |
| | ) |

## ORDER CONFIRMING MODIFIED PLAN OF REORGANIZATION

The First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code filed by Cable Ready Corporation ("CRC"), on December 3, 2013 (the "Plan"), and the Plan having been modified before confirmation on December 18, 2013 (the "Modified Plan");[1] and the Court having determined in accordance with Federal Rule of Bankruptcy Procedure 3019(a) that the proposed modifications contained in the Modified Plan do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing such modifications; as a result of which the Modified Plan shall be deemed accepted by all creditors and equity security holders who have previously accepted the Plan; and

It having been determined after hearing on notice that the requirements for confirmation set forth in Section 1129(a) (or, if appropriate, 11 U.S.C. §1129(b)) have been satisfied;

**IT IS ORDERED,** that the Modified Plan is confirmed. A copy of the Modified Plan is attached hereto as Exhibit A; and

**IT IS FURTHER ORDERED,** that except (i) as otherwise provided in the Plan or (ii) as otherwise provided under Final Order entered by the Bankruptcy Court, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin (i) the commencement or

---

[1] Capitalized terms herein shall have the same meanings ascribed to them in the Modified Plan.

continuation of any action, the employment of process or any act to collect, enforce, attach, recover or offset from the Debtor or from property of the Debtor, (ii) the creation, perfection or enforcement of any lien or encumbrance against any property of the Debtor or any property distributed under the Plan, or (iii) any Claim or Interest discharged, released or satisfied under the Confirmation Order, the Plan or pursuant to section 1141(d)(1) of the Bankruptcy Code; and

**IT IS FURTHER ORDERED,** that except with respect to conduct after the Effective Date, neither the Debtor, nor any of its employees (acting in such capacity) nor any professional person employed by it, or the Committee, nor any professionals person employed by it, shall have incurred or will incur any liability to any Entity for any action taken or omitted to be taken in connection with or related to the formation, preparation, dissemination or Confirmation of the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with Chapter 11 Case or the Plan, except in the case of willful misconduct – fraud, gross negligence or legal malpractice; and

**IT IS FURTHER ORDERED**, that Allan A. Rutland of Zeifman Partners Inc., 1 Toronto Street, Suite 910, Toronto, Ontario, M5C 2V6, will serve as the Oversight Person; and

**IT IS FURTHER ORDERED**, that the Debtor shall file an application for final decree no later than March 19, 2014, unless that time is extended by the Court.

Dated: December 19, 2013

**By the Court**

*Alan H. W. Shiff*
Alan H. W. Shiff
United States Bankruptcy Judge

# EXHIBIT A

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

In re:

)
)   Chapter 11
)
CABLE READY CORPORATION   )   Case No. 13-50970 (AHWS)
)
)

### FIRST AMENDED
### PLAN OF LIQUIDATION UNDER CHAPTER 11
### OF THE UNITED STATES BANKRUPTCY CODE
### (As Modified on December 18, 2013)

The Debtor, Cable Ready Corporation ("Debtor") proposes the following first amended

plan of liquidation, as modified on December 18, 2013 (the "Plan") pursuant to Bankruptcy

Code section 1129. Reference is made to the Disclosure Statement (hereinafter defined) for a

discussion of the Debtor's history, assets and other information, and for a summary and analysis

of the Plan.

## ARTICLE I.

## DEFINITIONS

A.    *Defined Terms*

As used herein, the following terms have the respective meanings specified below, unless

context requires otherwise.

1.    **"100 East Avenue, LLC"** shall mean the real estate holding company of which

the Debtor owns 25%.

2.    **"Accounts Receivable"** shall mean all uncollected, billed and unbilled Accounts

Receivable due under existing pre-petition and post-petition License Agreements.

3.    **"Administrative Claim"** shall mean any Claim for an administrative expense of the kind described in Bankruptcy Code section 503(b)m 503(c), 507(a) or 507(b), including, without limitation, any actual and necessary costs and expenses of preserving the Debtor's estate incurred after the commencement of the case and prior to confirmation of the Plan, any actual and necessary costs of operating the Debtor's business after the commencement of the case and prior to confirmation of the Plan, any indebtedness or obligations incurred by the Debtor in Connection with the operation of the business or for the acquisition or lease of property or the rendition of services after the commencement of the case and prior to confirmation of the Plan, including Professional Fee Claims allowed under Bankruptcy Code Sections 326, 330 and 331, and any fees due to the Office of the United States Trustee under 28 U.S.C. §1930(a)(6).

4.    **"Administrative Claim Bar Date"** shall mean 30 days after the Effective Date.

5.    **"Allowable Expenses"** shall mean any and all expenses incurred by the Debtor in connection with any Distribution Agreement, other than Tony Award Allowable Expenses.

6.    **"Allowed"** and **"Allowed Claim"** shall mean any Claim  (or portion thereof) to the extent it has not been withdrawn, paid in full or otherwise deemed satisfied in full and proof of which has been filed on or before the date designated by the Bankruptcy Court for filing proofs of claim (or, if not filed by such date, filed by such other date as the Bankruptcy Court orders), or, if no proof of claim if filed, any Claim that has been or hereafter is listed by the Debtor on its Schedules as liquidated in amount, not disputed and not contingent and, in all cases, a Claim as to which no objection has been filed, or as to which an objection has been filed and such Claim has been allowed in whole or in part by a Final Order, to the extent allowed by such Final Order.  Unless otherwise specified in the Plan or in a Final Order

2

allowing such Claim, "Allowed Claim" shall not include interest on the amount of such Claim maturing or accruing from and after the Petition Date.

7.      **"Allowed Administrative Claim"** shall mean any Administrative claim that is or becomes an Allowed Claim.

8.      **"Allowed Priority Tax Claim"** shall mean any Claim entitled to priority under Bankruptcy Code Section 507(a)(8) to the extent it is an Allowed Claim.

9.      **"Allowed General Unsecured Claim"** shall mean a Claim that is not an Administrative Claim or an Allowed Priority Claim, including, without limitation, any Claim arising from the rejection of executory contracts and unexpired leases, to the extent it is an Allowed Claim or a Settling Class Claim.

10.     **"Assets"** shall mean  all of the Debtor's assets including Cash in the Operating Accounts, Accounts Receivables, WBB, the Debtor's 25% interest in 100 East Avenue, LLC and Causes of Action.

11.     **"Ballot"** shall mean the form distributed to each holder of an Impaired Claim entitled to vote on this Plan on which the Holder may indicate acceptance or rejection of this Plan or any election for treatment of such Claim under this Plan.

12.     **"Bank"** shall mean Connecticut Community Bank d/b/a Norwalk Bank & Trust.

13.     **"Bankruptcy Code"** shall mean title 11 of the United States Code, as now in effect or hereafter amended.

14.     **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Connecticut, Bridgeport Division.

15.     **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, as amended, the Local Rules of Civil Procedure of the United States District Court for the District

3

of Connecticut, as amended, the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the District of Connecticut, as amended, and any standing orders of the Bankruptcy Court.

16.    **"Bar Date"** shall mean the date fixed by order(s) of the Bankruptcy Court for filing proofs of claim included in the notice dated June 24, 2013, which established a Bar Date of October 21, 2013 for non-governmental entities and December 18, 2013 for governmental entities.

17.    **"Business Day"** shall mean any day other than a Saturday, a Sunday or a "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

18.    **"Case"** shall mean the chapter 11 case commenced by the Debtor on the Petition Date and pending before the Bankruptcy Court.

19.    **"Cash"** shall mean currency of the United States of America.

20.    **"Cash Collateral Orders"** shall mean the Third Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection dated August 1, 2013, the Fourth Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection dated August 29, 2013, the Fifth Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection dated September 26, 2013, and the Sixth Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection dated October 16, 2013, Seventh Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection dated October 28, 2013, Eighth Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection dated November 14, 2013 and Ninth Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection dated November 25, 2013

21.     **"Cash on Hand"** shall mean cash remaining in the Debtor's Operating Account after making the distributions as provided for in Article II.C. of the Plan.

22.     **"Causes of Action"** shall mean any and all actions, Claims (as defined herein), rights, defenses, impleader Claims, chooses in action, controversies, rights to legal or equitable remedies, rights to payment and Claims whatsoever, whether known, unknown, reduced to judgment or not, liquidated, unliquidated, fixed, contingent, matured, unmatured and whether asserted or assertable indirectly or derivatively, at law, in equity or otherwise, including but not limited to Avoidance Actions.

23.     **"Claim"** shall mean a claim as defined in Section 101(5) of the Bankruptcy Code, against the Debtor.

24.     **"Claimant"** shall mean the Holder of a Claim.

25.     **"Claim Objection Deadline"** means the date that is thirty (30) days after the Effective Date and shall be the last day for objecting to claims asserted against the Debtor's Estate.

26.     **"Class"** shall mean each class of Allowed Claims or Equity Interests designated in Article III of the Plan.

27.     **"Committee"** shall mean the Official Committee of Unsecured Creditors appointed by the Court on July 5, 2013.

28.     **"Committee Counsel"** shall mean Zeisler & Zeisler, P.C., counsel to the Committee.

29.     **"Confirmation"** shall mean the entry of the Confirmation Order. Those matters which, pursuant to Bankruptcy Code section 1141, would ordinarily take effect on confirmation shall instead take effect at the Effective Date.

5

30. **"Confirmation Date"** shall mean the date upon which the Confirmation Order is entered by the Bankruptcy Court.

31. **"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of Bankruptcy Code section 1129.

32. **"Consummation Date"** shall mean the date that the Plan Liquidators make the last Distribution under the Plan.

33. **"Counterparty"** shall mean any Producer or third party that is a party to a distribution agreement with the Debtor.

34. **"Creditor"** means a creditor as defined in 11 U.S.C. Section 101(10).

35. **"Debtor"** shall mean Cable Ready Corporation.

36. **"Debtor's Commissions"** shall mean the commissions due to the Debtor under a Pre-Petition Distribution Agreement or Post-Petition Distribution Agreement.

37. **"Debtor's Counsel"** shall mean Pullman & Comley, LLC, bankruptcy counsel for the Debtor.

38. **"Disclosure Statement"** shall mean the disclosure statement filed by the Debtor in connection with the Plan pursuant to Bankruptcy Code section 1125, as amended, modified or supplemented from time to time.

39. **"Disputed Claim"** shall mean a Claim against the Debtor that (a) was listed by the Debtor in its Schedules as disputed, contingent, or unliquidated, and for which no proof of Claim was filed or (b) was timely filed prior to the applicable Bar Date or deemed timely filed under applicable law or under the Plan and as to which the Debtor, or any other party in interest has filed an objection (where such objection has not been withdrawn or overruled by a Final Order). To the extent an objection relates to the allowance of only a part of a Claim, such Claim

6

shall be a Disputed Claim only to the extent of the objection. Prior to the time that an objection has been or may be timely filed, for the purposes of the Plan a Claim shall be considered a Disputed Claim to the extent that the amount of the Claim specified in the proof of Claim exceeds the amount of the Claim scheduled by the Debtor as other than disputed, contingent or unliquidated.

40.     **"Distribution Account"** shall mean the separate, segregated interest bearing account established by the Plan Administrators to deposit all funds collected by the Plan Administrators pursuant to this Plan.

41.     **"Distribution Agreement"** shall mean a Post-Petition Distribution Agreement or a Pre-Petition Distribution Agreement.

42.     **"Distribution Date"** shall mean the date or dates on which the Holder of an Allowed Claim shall receive a Distribution pursuant to this Plan.

43.     **"Effective Date"** shall mean (a) the first Business Day after fourteen days have elapsed following the Confirmation Date or (b) if the Confirmation Order has been stayed by a court of competent jurisdiction, the first Business Day following the date on which such stay is lifted or dissolved by a court of competent jurisdiction.

44.     **"Entity"** shall mean the meaning set forth in section 101(15) of the Bankruptcy Code.

45.     **"Escrow Fund"** shall mean the monies deposited by the Debtor in a separate segregated account between July 31, 2013 and August 31, 2013, in accordance with the Third Preliminary Cash Collateral Order dated August 1, 2013.

46.     **"Estate"** shall mean the bankruptcy estate created on the Petition Date pursuant to Section 541 of the Bankruptcy Code.

47.    **"Estate Funds"** shall mean Cash on Hand, Debtor's distributions, Waived Commissions and Cash from the liquidation of all other Estate Assets and shall be available to fund all administrative claims, priority tax claims, U.S. Trustee Fees, the Reserve and other post-confirmation fees and expenses of the Estate and the Unsecured Claim Fund.

48.    **"Final Decree"** shall mean the order or decree signed by the Bankruptcy Court closing the Chapter 11 case.

49.    **"Final Order"** shall mean an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and as to which the time to appeal or to seek certiorari or review has expired and as to which no appeal or petition for certiorari or review is pending or as to which any right to appeal or to seek certiorari or review has been waived.

50.    **"General Unsecured Claim"** shall mean any Claim, other than an Administrative Claim, a Priority Non-Tax Claim, a Priority Tax Claim or a Secured Claim.

51.    **"Holder"** shall mean the holder of a Claim or Interest.

52.    **"Impaired"** shall mean impaired within the meaning of Code section 1124.

53.    **"Impaired Interest"** shall mean an Interest which is Impaired.

54.    **"Initial Distribution Date"** shall mean 45 days after the Effective Date.

55.    **"Interest"** shall mean any equity interest in the Debtor whether in the form of a common or preferred stock, stock options, warrants, partnership interests, membership interests or other security interests.

56.    **"License Agreement"** shall mean any agreement by and between the Debtor and a Media Outlet for the Media Outlet's use of the Producer's programs.

57.    **"Media Outlet"** shall mean the buyers of programs created by a Producer pursuant to a License Agreement.

58.    **"Medstar"** shall mean Medstar Television, Inc.

59.    **"Medstar Post-Petition Agreement"** shall mean the Distribution Agreement between the Debtor and Medstar.

60.    **"Operating Account"** shall mean the Debtor-in-Possession Account established by the Debtor post-petition.

61.    **"Opt-In"** shall mean the Producer's option to elect to be bound by the terms of the Settlement Class including a complete waiver of 40% of the Producer Commission collected after the Effective Date, and any and all claims against the Estate.

62.    **"Oversight Person"** shall mean the person appointed by the Committee and charged with certain oversight functions as set forth in Article VI of the Plan and identified in the Confirmation Order.

63.    **"Person"** shall mean a natural person or any legal entity or organization including without limitation, any corporation, general or limited liability partnership, limited liability company, business trust, unincorporated organization or association, joint stock company, trust association, governmental body or any agency, instrumental or political subdivision thereof or any other form of legal entity.

64.    **"Petition Date"** shall mean June 21, 2013.

65.    **"Plan"** shall mean this Chapter 11 Plan of Liquidation and any exhibits or duly authorized amendments hereto.

66.    **"Plan Administrator"** shall mean the person(s) or entity(ies) authorized to exercise and perform the rights, powers and duties held by the Estate, including, without

9

limitation, the authority under Bankruptcy Code §1123(b)(3) to provide for the settlement, adjustment, retention and enforcement of claims and interests of the Estate, including but not limited to, the pending claims objection.  Gary Lico and David Fox shall be the Initial Plan Administrator.

67.     **"Plan Documents"** shall mean any contract, instruments, securities, releases or any agreements delivered pursuant to, or related to, or implementing the Plan.

68.     **"Plan Escrow"** shall mean the escrow set up by the Debtor to hold Accounts Receivable collected on or after November 10, 2013.

69.     **"Post-Petition Distribution Agreement"** shall mean any agreement by and between a Producer and the Debtor entered into after the Petition Date.

70.     **"Pre-Petition Distribution Agreement"** shall mean any agreement by and between a Producer and the Debtor entered into prior to the Petition Date.

71.     **"Producer"** shall have the same meaning as Counterparty.

72.     **"Producer Commission"** shall mean the percentage due to a Producer pursuant to a Distribution Agreement between such Producer and the Debtor after deducting all Allowable Expenses.

73.     **"Professional Fee Claim"** shall mean a claim against the Debtor's estate under Sections 326, 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a professional or other entity for services rendered or expenses incurred in the Bankruptcy Case.

74.     **"Pro Rata"** shall mean the proportion that the Allowed Claim in a particular Class bears to the aggregate amount of all Claims (including Disputed Claims until Allowed as disallowed) in such class.

10

75.    **"Schedules"** shall mean the schedules of assets and liabilities and the statement of financial affairs, as amended and as may be further amended, filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Code section 521 and Bankruptcy Rule 1007.

76.    **"Settlement Class"** shall mean the class comprised of the Producers that choose to Opt-In and receive 60% of its Producer Commission collected by the Debtor from the Petition Date through the date all funds have been collected as set forth in Article IV of the Plan.

77.    **"Settlement Class Creditor"** shall mean a Creditor holding a General Unsecured Claim who opts to participate in the Settlement Class.

78.    **"Tax"** shall mean any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. **"Tax"** shall include any interest or additions attributable to, imposed on or with respect to such assessments.

79.    **"Tony Awards"** shall mean the Tony Awards Productions in its capacity as a Counterparty to a distribution agreement dated September 20, 2011.

80.    **"Tony Awards Allowable Expenses"** shall mean 60% of the expenses due under the Distribution Agreement if Tony Awards elects to Opt-In pursuant to Article IV of the Plan, which expenses shall be paid by the Debtor.

81.    **"Unsecured Claim Fund"** shall mean the fund comprised of Cash on Hand, Debtor's Commissions, proceeds from the sale and/or distribution of WBB, proceeds from the sale of the Debtor's 25% interest in 100 East Avenue, LLC, the Waived Commissions, the sale

11

of any other Estate property, proceeds from the Causes of Actions and less Administrative Claims, Priority Tax Claims and the Reserve.

82.     **"U.S. Trustee"** shall mean the United States Trustee for Region 2.

83.     **"Waived Commissions"** shall mean all commissions waived by Counterparties pursuant to Article IV of the Plan.

84.     **"U.S. Trustee Fees"** shall mean all fees and charges assessed against the Debtor under Section 1930 of Title 28 of the United States Code, plus all interest assessed pursuant to 31 U.S.C. §3717.

85.     **"WBB"** shall mean the Debtor's asset, Women Behind Bars.

B.     *Undefined Terms*

A term that is used in the Plan or Disclosure Statement and not defined in either the Plan or Disclosure Statement, but that is defined in the Bankruptcy Code or Bankruptcy Rules shall have the meaning set forth therein.

## ARTICLE II.

## TREATMENT OF UNCLASSIFIED CLAIMS

A.     *Administrative Claims*

1.     Administrative Claims are not classified under the Plan and holders thereof shall not be entitled to vote to accept or reject the Plan.

(a)     Payment of Administrative Claims

Each holder of an Allowed Administrative Claim shall receive from Estate Funds, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (i) as soon as reasonably practicable after the Effective Date or (ii) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.

12

(b)    U.S. Trustee Fees

In accordance with Section 1129(a)(12) of the Bankruptcy Code and 28 U.S.C. §1930, all quarterly fees payable to the U.S. Trustee shall be paid by the Debtor from Estate Funds in full on or before their respective due dates and shall continue to be assessed and paid until such time as a final decree closing, an order converting, or an order dismissing this case, is entered by the Court. The Debtor shall also timely file monthly operating reports every month until such time as a final decree is entered by the Court or the Court enters an order converting or dismissing this case.

(c)    Professional Fee Claims

The Debtor or Debtor's professionals asserting a Professional Fee Claim for services rendered before the Effective Date must, unless previously filed, file and serve an application for final allowance of such Professional Fee Claim no later than the Administrative Claim Bar Date.

(d)    Administrative Claim Bar Date

The Bar Date for filing a request for payment of administrative expenses is 5:00 p.m. (EST) on the 30th day after the Effective Date for all entities, including governmental units and Professionals.    Each request for payment of an administrative expense, including any attachments, must be filed with the clerk of the United States Bankruptcy Court, District of Connecticut, 915 Lafayette Boulevard, Bridgeport, Connecticut 06604. Failure to file a request for payment of administrative expense on or before the 30th day after the Effective Date will result in such claim being forever barred from receiving any distribution of cash or property from the Estate; provided, however, that any Counterparty seeking an Administrative Claim must comply with the provisions of Article IV of the Plan to be eligible to assert an Administrative Claim.

13

B. *Allowed Priority Tax Claims*

Allowed Priority Tax Claims are not classified under the Plan, and holders thereof shall not be entitled to vote to accept or reject the Plan. Unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the Debtor, each holder of an Allowed Priority Tax Claim shall receive from the Debtor from Estate Funds, in full satisfaction of its Allowed Priority Tax Claim, payment, in full in Cash of a total value, as of the Effective Date, equal to the Allowed amount of such Claim plus interest at the applicable rate.

C. *Payments Relating to Pre-Petition Distribution Agreements*

Counterparties assert that any payment received by the Debtor after the Petition Date that but for the filing would be due to a Counterparty as a commission relating to a Pre-Petition Distribution Agreement is an administrative expense. It is the Debtor's position that any such monies collected post-petition constitutes property of the Estate and such Counterparty holds an unsecured claim for monies collected post-petition. This issue is resolved pursuant to Article IV of the Plan. Please see Article IV for a description and explanation of the resolution.

D. *Payments relating to Post-Petition Distribution Agreements*

One-Hundred percent (100%) of commissions due to Counterparties of Post-Petition Distribution Agreements will continue to be paid in accordance with such Post-Petition Distribution Agreements.

E. *Settlement and Resolution of the Secured Claim of the Bank*

Upon the entry of the Confirmation Order, the following settlement with the Bank will be deemed to be approved pursuant to Bankruptcy Rule 9019. The Bank will execute the UCC-3 Termination Statement releasing all its liens, claims and encumbrances asserted against the assets of the Debtor and the assets of the Estate. The Bank will be deemed to have an Allowed General Unsecured Claim of $1,470,000. The Bank will be permitted to apply the $30,135.00 of

14

post-petition interest that was paid to the Bank pursuant to the Cash Collateral Orders, towards the amounts due and owing to the Bank by the Debtor, provided, however, that application of such funds shall not reduce the Bank's Allowed General Unsecured Claim of $1,470,000 for the purposes of calculating its Pro-Rata distribution in Class 1.

## ARTICLE III.

## DESIGNATION OF CLASSES OF CLAIMS AND CLASSES OF INTERESTS IMPAIRED UNDER THE PLAN

All Allowed Claims and Equity Interests, except allowed Administrative and Priority Tax Claims, are placed in the following Classes for all purposes, including voting, Confirmation and distributions pursuant to the Plan. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of a different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

### A. *Class 1 – Allowed General Unsecured Claims*

The Class 1 Claims approximate $4,600,00.00. Holders of Class 1 Claims will receive their pro rata share of the Unsecured Claim Fund (after payment of Allowed Administrative Expenses and Priority Tax Claims, as required by the Plan, or adequate reserve therefore has been established). On the Initial Distribution Date, the Holders of Allowed Class 1 Claims will receive distributions from the funds available in the Unsecured Claim Fund. Thereafter, distributions of funds available in the Unsecured Claim Fund will be made quarterly to Holders of Allowed Class 1 Claims.

Holders of Allowed Class 1 Claims who are Counterparties may, however, elect to participate in the Settlement Class described in Article IV below.

B.    *Class 2 – Equity Interests*

This Class consists of 100% interest held by Gary Lico in the Debtor. Gary Lico's interest will be extinguished, and he will receive no distribution under the Plan and is deemed to have rejected the Plan pursuant to 11 U.S.C. § 1126(g).

## ARTICLE IV.

## SETTLEMENT CLASS

Counterparties holding Allowed Class 1 Claims may elect to Opt-In and participate in the Settlement Class. If such an option is made, in lieu of having its entire Claim being treated as an Unsecured Claim, such Counterparties will instead receive sixty (60%) of what they would otherwise be entitled to receive as a commission on receivables collected after the Petition Date provided, however, with the exception of the Tony Awards, such payment will be reduced by Allowable Expenses. If the Tony Awards elects to Opt-In, then in lieu of having its entire claim being treated as an Unsecured Claim, Tony Awards will instead receive 60% of what it would otherwise be entitled to receive under the Distribution Agreement on Accounts Receivables collected after the Petition Date; provided, however, that although the Debtor will pay the Tony Awards Allowable Expenses, Tony Awards will pay the balance (40%) of the expenses due under the Distribution Agreement. Tony Awards will be deemed to waive any claim against the Estate for the balance of the 40% expenses and the balance of the 40% commission and waive any litigation claims against the Estate on any theory that a Counterparty would be entitled to 100% of the commission provided for under the Distribution Agreement going forward or retroactively since the Petition Date. Such payments will be made through and including the earlier of the date that all Accounts Receivable have been collected with respect to a Distribution

16

Agreement or twenty-one months after the Effective Date. If there are any remaining Accounts Receivable to be collected after the expiration of the 21 months, then the Counterparty to the Distribution Agreement, whose program has generated the receivable, will be assigned the right to pursue any uncollected receivable.

If a Counterparty elects to participate in the Settlement Class, such Counterparty will be deemed to waive any claim against the Estate for the balance of the 40% commission and waive any litigation claims against the Estate on any theory that a Counterparty would be entitled to 100% of the commission provided for under the Distribution Agreement going forward or retroactively since the Petition Date.

The intent of the Plan is to ensure that all Counterparties, regardless of amounts paid or escrowed pursuant to the Cash Collateral Orders, are paid an equal percentage of their commission. Pursuant to the Cash Collateral Orders, certain Counterparties received distributions that were either more than 60% or less than 60%. To ensure that all Counterparties, regardless of the amounts paid or escrowed pursuant to the Cash Collateral Orders are paid an equal percentage of their commission, it will be necessary to do a true up. To true up the payments, the following procedures will be implemented. The monies held in the Escrow Fund, which amount equals 50% of the Producer Commission, such Counterparty will receive the 50% held in escrow plus an additional 10% of the Producer Commission provided for in such Counterparty's Pre-Petition Distribution Agreement. To the extent a Counterparty received 50% of the Producer Commission pursuant to the Fourth Preliminary Order Authorizing Use of Cash Collateral and Granting Adequate Protection, such Counterparty will be paid an additional 10% of its Producer Commission. If a Counterparty received 100% of the Producer Commission pursuant to the Fifth Preliminary Order Authorizing Use of Cash Collateral and Granting

17

Adequate Protection, the Estate will receive a credit of 40% of the amount paid which will be applied to payment of future commissions due such Counterparty pursuant to the Plan. If no further commissions are due to such Counterparty, then such credit will be applied to such Counterparty's pro rata share of any distribution it is entitled to receive as an Unsecured Creditor. Counterparties will not be entitled to assert a claim for the balance of unpaid commissions.

The Ballot provided with the Plan provides a mechanism by which a Counterparty can elect to Opt-In. To Opt-In, a Counterparty must select the Opt-In election on the Ballot.

Any Counterparty that elects to Opt-In is required to file an amended proof of claim on or before thirty (30) days after the Effective Date, limited to commissions collected by CRC pre-petition, but not paid as of the Petition Date. If any Counterparty that has elected to Opt-In fails to file an amended proof of claim on or before thirty (30) days after the Effective Date, then the amount of such Counterparty's claim will be based on the amount reflected in the books and records.

The Debtor and Committee reserve all rights to object to the amounts asserted in an amended proof of claim.

**ANY COUNTERPARTY THAT DOES NOT ELECT TO OPT-IN SHALL HAVE UNTIL THE DEADLINE SET BY THE BANKRUPTCY COURT TO OBJECT TO THE PLAN, TO OBJECT TO THE PAYMENT TO COUNTERPARTIES OF ONLY SIXTY PERCENT (60%) OF ITS COMMISSIONS ATTRIBUTABLE TO ACCOUNTS RECEIVABLE GENERATED PRE-PETITION AND COLLECTED POST-PETITION. FAILURE TO OBJECT BY THE PLAN CONFIRMATION DEADLINE WILL RESULT**

18

**IN SUCH COUNTERPARTY BEING FOREVER BARRED FROM RAISING THAT OBJECTION AND ASSERTING AN ADMINISTRATIVE CLAIM.**

## ARTICLE V.

## MEANS OF IMPLEMENTATION

A.  *Funding*

The source of funding for the Plan shall consist of Cash on Hand, collection of Accounts Receivable, sale of the WBB Asset, the Waived Commissions, proceeds from Causes of Action and the sale of the Debtor's 25% interest in 100 East Avenue, LLC.

B.  *Appointment of Plan Administrator*

1.  Identity

Gary Lico and David Fox shall be deemed the Plan Administrator for the Debtor. The Plan Administrator shall assume it duties as of November 10, 2013, subject to such duties being terminated if a Confirmation Order does not enter on or before December 10, 2013.

2.  Responsibilities of Plan Administrator

The responsibilities of the Plan Administrator shall include, but not be limited to, (i) collecting all Accounts Receivable; (ii) marketing WBB (specifically the Plan Administrators will have the right under the Plan to license WBB to a distributor selected by the Plan Administrator provided, however, such distributor and the sale price must be approved by the Oversight Person and such distributor will receive a commission of no more than 35%); (iii) marketing and selling CRC's 25% interest in 100 East Avenue, LLC, subject to Oversight Person approval; (iv) distributing all funds collected in the manner set forth herein; (v) establishing the Distribution Account; (vi) providing monthly reports of all funds collected and distributed to the Oversight Person and such other reports reasonably requested by the Oversight Person which shall be due the 15th of every month for the preceding month; (vii) implementing all distributions

19

provided for under this Plan; (viii) overseeing the filing all required tax returns, and paying taxes and other obligations on behalf of the Debtor from Estate funds; (ix) if directed by the Oversight Person, prosecuting or otherwise resolving Causes of Action, facilitating the prosecution of and settlement of, objections to, and estimation of claims, subject, however, to the approval of the Oversight Person; and (x) such other responsibilities as may be vested in the Plan Administrator pursuant to Bankruptcy Court order or as may be necessary or proper to carry out the provisions of the Plan.

The Plan Administrator will be required to post a bond representing 150% of the Cash on Hand as of the date of the Confirmation Order, and such bond shall be paid with the Estate Funds and shall be in favor of the United States of America.

3.     Powers and Authority of Plan Administrator

The power and authority of the Plan Administrator shall, without any further Bankruptcy Court approval, include, without limitation, the following: (i) make the distributions in accordance with the Plan; (ii) subject to Oversight Person approval, invest Estate Funds and withdraw Estate Funds to make the distributions in accordance with the Plan; (iii) liquidating and converting the remaining assets of the Debtor to cash in accordance with the Plan; (iv) pay taxes and other obligations owed by the Debtor from Estate Funds in accordance with the Plan; (v) to engage employees or independent contractors, professional persons to assist the Plan Administrator with respect to its responsibilities, provided, however, such costs will be paid by the Plan Administrator from its Commission; (vi) paying Allowed amounts due any professionals employed by the Debtor or the Committee from Estate Funds; (vii) to interpret this Plan in the Plan Administrator's reasonable discretion subject to the input of the Oversight Person; and (viii) such other powers and authorities as may be vested in the Plan Administrator by the Bankruptcy

Court or as may be necessary and proper to carry out the provisions of this Plan, except as expressly set forth herein.

4.    Retention of Professionals

The Plan Administrator may employ and compensate professionals, including counsel, consultants and financial advisors, as needed to assist in fulfilling its obligations under the Plan, subject to the approval of the Oversight Person.  Subject to the approval of the Oversight Person, the Plan Administrator may employ professionals including, but not limited to those who were previously employed by the Debtor or Committee.

Compensation

The Plan Administrator will be compensated as follows: (i) with respect to the collection of the Accounts Receivable, compensation will be paid on the sliding scale in the following manner:  7.5% of the Accounts Receivable until half of all Accounts Receivables have been collected; then 10% until three quarters of all Accounts Receivables have been collected; then 12.5% of the remaining Accounts Receivable; (ii) with respect to WBB, the Plan Administrator will receive 10% of the gross amount until $250,000 is collected and paid into the Unsecured Claim Fund; then 15% until an additional $250,000 is collected and paid into the Unsecured Claim Fund; then 20% on all additional sales; and (iii) with respect to the interest in 100 East Avenue, LLC, the Plan Administrator will receive 6% of any proceeds from the sale of same.

All of the Plan Administrator's operating expenses which includes but is not limited to rent, utilities, bookkeeping staff, postage and copying costs will be paid by the Plan Administrator from the Plan Administrator's compensation and shall not be the responsibility of the Estate.

21

5.     Removal of Plan Administrator

Any creditor of the Estate or the Oversight Person has standing to seek an order from the Bankruptcy Court, after Notice of Hearing, to remove the Plan Administrator or any successor plan administrator appointed pursuant to the Plan for cause shown.

6.     Successor to the Plan Administrator

In the event the Plan Administrator is removed, resigns, or otherwise ceases to serve as Plan Administrator, the Oversight Person shall select a successor plan administrator within twenty (20) business days of the removal, resignation or cessation of service by the incumbent Plan Administrator. The Oversight Person shall file a notice of such successor, which shall be served upon all parties that have requested notice in the case. If the Oversight Person fails to act in accord with the provisions of this paragraph, any party-in-interest may file a motion for a successor plan administrator, which notice shall be served on all parties who requested notice in the case and subject to hearing and bankruptcy court approval. Any successor plan administrator shall be subject to the same qualifications and shall have the same rights, powers, duties and discretion and otherwise be in the same position as the originally named Plan Administrator. Wherever reference is made in this Plan to Plan Administrator, the same shall be deemed to refer to the Successor Plan Administrator acting hereunder. The Oversight Person may not be named as the Successor Plan Administrator.

7.     Termination.

The duties, responsibilities and powers of the Plan Administrator shall terminate on the earlier of 24 months after the Effective Date or date all Assets have been liquidated.

8.     Records.

At the Plan Administrator's expense, the Plan Administrator shall maintain good and sufficient books and records of the Estate Funds, account relating to the assets of the Debtor's Estate, all post-confirmation transactions undertaken by the Plan Administrator, all expenses incurred by or on behalf of the Plan Administrator and after the Effective Date and all distributions contemplated or effectuated under the Plan.

C.     *Implementation*

The Plan Administrators shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan.   The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, directing the Plan Administrators, any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect the transfers of property required by the Plan, including any notice of satisfaction, release or discharge of any lien, claim or encumbrance not expressly preserved in the Plan and any correction or other deed with respect to title, and to perform any act, including the satisfaction of any lien, that is necessary for the consummation of the Plan.   Pursuant to sections 105, 1141,  1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

D.     *Payment of Fees and Expenses*

From the Effective Date until the entry of the Final Decree, all fees and expenses of the Debtor and the Committee and their agents, professionals and employees incurred in connection with all matters related to the Case and consummation and implementation of this Plan shall be paid from Estate Funds subject to Bankruptcy Court approval.

23

## ARTICLE VI.

## OVERSIGHT PERSON

On or before the Confirmation Date, the Committee shall select a person to become the Oversight Person. The Oversight Person shall be the representative of all Holders of Allowed Unsecured Claims and Settlement Class Creditors, and shall oversee the post-Effective Date activities of the Plan Administrator in accordance with the Plan.

The powers and duties of the Oversight Person shall be limited to the following: (a) monitoring the activities of the Plan Administrator; (b) exercising reasonable discretion with regard to the Plan Administrator duties that require Oversight Person approval; (c) determining which, if any, Causes of Action should be pursued by the Plan Administrator, (d) reporting on the activities of the Plan Administrator on a monthly basis to the Bank, and (e) participating in the removal of the Plan Administrator for cause and the appointment of any successor Plan Administrator.

The Oversight Person may retain counsel to represent the Oversight Person with respect to any claim or action asserted against the Oversight Person arising from the Oversight Person's exercise of his/her duties hereunder with the exception of claims for fraud, gross negligence and willful misconduct and to advise the Oversight Person on matters concerning the Causes of Action, and the Oversight Person's fiduciary duties. The reasonable and necessary expenses of the Oversight Person, including attorneys' fees and expenses, that may be incurred in the performance of the Oversight Person's fiduciary duties, and shall be paid by the Plan Administrator from Estate Funds.

The Oversight Person shall not be liable to the Debtor, the Debtor's' creditors or any other Entity or party in interest for any error of judgment made in good faith, but only for gross negligence, willful misconduct, or fraud. The Oversight Person shall not be liable for any action

24

taken or omitted in good faith and reasonably believed by them to be authorized within the discretion or rights or powers conferred upon him/her by the Plan. In performing his/her duties under the Plan, the Oversight Person may retain and consult with counsel selected by it, and shall have no liability for any reasonable action taken upon the advice of such counsel. None of the provisions of the Plan shall require or be construed as requiring the Oversight Person to expend or risk their own funds or otherwise incur or expose them to personal financial liability in the performance of any of his/her duties under the Plan or in the exercise of any of their rights and powers. The Oversight Person may rely without inquiry upon any writing delivered to it pursuant to the Plan which it believes in good faith to be genuine and to have been given by a proper person.

In the event the Oversight Person resigns or otherwise ceases to serve as the Oversight Person, the Bank shall select a successor oversight person within twenty (20) business days of the resignation or cessation of service by the incumbent Oversight Person.

The Oversight Person will terminate upon completion of all payments and distributions to be made pursuant to the Plan.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Collection and Segregation Process*

All Accounts Receivable collected on or after November 10, 2013 will be deposited into the Plan Escrow. To the extent the collections are attributable to a Pre-Petition Distribution Agreement, then 60% of the Producer Commission less Allowable Expenses will be paid to a Settlement Class Creditor within ten (10) business days of the receipt of the funds. The portion of the funds constituting Waived Commissions will be deposited into the Distribution Account. To the extent that the Accounts Receivable collected are attributable to a Post-Petition

25

Distribution Agreement, then the amount of the commission due the Counterparty will be paid in accordance with the terms of such Post-Petition Distribution Agreement. The Debtor's Commission attributable to collection of Accounts Receivable shall be deposited into the Distribution Account. Thereafter, the funds in the Distribution fund less the Reserve and the Plan Administrator's commission, shall be deposited into the Unsecured Claim Fund.

All collections from the sale of WBB and 100 East Avenue, LLC will be deposited directly into the Plan Account and after calculation and payment of the Plan Administrator commission, remaining funds shall be deposited into the Distribution Account.

B.      *Timing of Distributions Under the Plan*

Funds available in the Unsecured Claim Fund shall be paid to Holders of Allowed Unsecured Claims on the Initial Distribution Date continuing each and every quarter thereafter until the earlier of twenty-four (24) months after the Effective Date or the assets have been liquidated and/or Accounts Receivable collected.

C.      *Method of Payment*

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank.

D.      *Prosecution of Objections*

After the Confirmation Date, only the Plan Administrator shall have authority to file, settle, compromise, withdraw or litigate to judgment objections to any Claim, administrative Claim or Disputed Claim or Disputed Interest, subject to review and approval of the Oversight Person.

E.    *No Distribution Pending Allowance*

Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Disputed Claim are resolved by Final Order.

F.    *Deposit of Cash Distributions Related to Disputed Claims*

1.    Unless otherwise agreed to in writing by the Plan Administrator and the Holder of any Claim to which this section applies and exclusive of General Unsecured Claims, on the Effective Date the Plan Administrator shall reserve Cash equal to 100% of the Cash to be distributed on account of Disputed Claims that would be Allowed Claims but for the pendency of a dispute with respect thereto. Such Cash shall be held for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

2.    In determining the amount of Cash to be distributed under the Plan on account of Disputed Claims, the calculation of the distribution to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts.

3.    The Plan Administrator shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating or limiting the amount of Cash that must be so reserved. Any Creditor whose Claims is so estimated shall have no recourse to any assets thereto distributed on account of any Allowed Claim, or any other Entity or property if the Allowed Claim of that Creditor as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims account (on a pro rated basis with other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims allowed by Final Order.

27

G.    *Distribution of Allowance*

Within ten (10) business days after the allowance of a Disputed Claim, in the event a Distribution has been made as of the date such claim becomes a Allowed Claim, the Plan Administrator shall distribute from the funds reserved in accordance with Article VII, Section E of this Plan, all Cash to which a Holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

H.    *Investment of Segregated Cash and Property*

To the extent practicable and subject to the approval of the Oversight Person, the Plan Administrator may invest any Cash segregated on account of any Disputed Claim, undeliverable distribution, or any proceeds thereof (i) in a manner that will yield a reasonable net return taking into account the safety of the investment, or (ii) in any manner permitted by section 345 of the Bankruptcy Code; provided, however, that the Plan Administrator shall be under no obligation to so invest such Cash or proceeds and shall have no liability to any party for any investment made or any omission to invest such Cash, or proceeds.

I.    *Distribution After Disallowance*

The Cash segregated on account of Disputed Claims, including the allocable portion of the net return yielded from any investment thereof remaining after all Disputed Claims have been resolved, shall be deposited into the Unsecured Claim Fund.

J.    *Delivery of Distributions*

Distributions to holders of Allowed Claims shall be made: (1) at the addresses set forth on the respective Proofs of Claim or Proofs of Interests filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the Plan Administrator after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no

28

Proof of Claim or Proof is filed and the Plan Administrator has not received a written notice of a change of address.

K.     *Undeliverable Distributions*

If any Distribution is returned to the Plan Administrator as undeliverable, no further distribution shall be made to the holder unless and until the Plan Administrator is notified in writing of such holder's then current address. Undeliverable distributions shall remain in the possession of the Plan Administrator until the earlier of (i) such time as a distribution becomes deliverable or (ii) such undeliverable distribution becomes an unclaimed distribution pursuant to Article VII, Section L of the Plan, after which time, any undeliverable distribution shall be deposited into the Unsecured Claim Fund.

Nothing contained in the Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim or an Allowed Interest.

L.     *Unclaimed Distributions*

If Cash to be distributed under the Plan is not claimed by the Entity entitled thereto before the later of (i) one hundred and twenty (120) calendar days after the Distribution Date or (ii) one hundred and twenty (120) calendar days after an Order allowing the Claim of the Entity becomes a Final Order, such Cash shall be deposited into the Unsecured Claim Fund.

M.     *Set-offs*

The Plan Administrator may, but shall not be required to set-off against the Distributions to be made pursuant to the Plan, the claims, obligations, rights, Causes of Action and liabilities of any nature that the Debtor, or the Estate may hold against the Holder of an Allowed Claim, provided, however, that neither the failure to effect such a set-off nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Estate of any such claims,

29

obligations, rights, causes of action and liabilities that the Debtor or Estate has or may have against such Holder.

N.    *Diminimus Distributions*

No distribution of less than $10.00 shall be made to any Holder of a Claim.

## ARTICLE VIII.

## REJECTION AND ASSUMPTION OF
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Rejection of Pre-Petition Distribution Agreements*

The entry of the Confirmation Order shall constitute approval to reject all Pre-Petition Distribution Agreements. If a Counterparty to a Distribution Agreement has opted to participate in the Settlement Class, then such Counterparty's unsecured claim shall be limited to the amount provided in Article IV. If a Counterparty to a Distribution Agreement did not elect to participate in the Settlement Class, then all Allowed amounts due such Counterparty shall be a General Unsecured Claim.

B.    *Rejection of All Other Executory Contracts or Unexpired Leases*

The entry of the Confirmation Order shall constitute approval to reject any executory contract or unexpired lease, including the lease of nonresidential real estate between the Debtor and 100 East Avenue, LLC, to the extent such Executory Contract or Unexpired Lease were valid and in effect as of the Petition Date of this Plan. The party to any such executory contract or unexpired lease shall file a proof of claim within thirty (30) days of the Effective Date or be forever barred from making a claim or receiving a distribution with respect to such claim. Allowed Claims for damages arising out of the rejection of any such Executory Contract or Unexpired Lease shall be General Unsecured Claims.

30

The Debtor does not consider a License Agreement to be an executory contract and nothing contained herein shall be construed to deem a License Agreement as rejected.

C.     *Termination of the MedStar Post-Petition Agreement*

The Debtor and Medstar agree that the Medstar Post-Petition Agreement will be deemed to be terminated as of the Effective Date.  Notwithstanding any other provision in the Medstar Post-Petition Agreement, such termination will in no way impact the Plan Administrator's rights and obligations to collect and distribute on behalf of the Estate and Medstar, the commissions on the License Agreements listed below.  Nor will such termination result in any claim, cost or other expense against the Estate:  The License Agreement between the Debtor and Sci-Fi Channel Europe LLC dated September 13, 2013; the License Agreement between the Debtor and RTL Television GmbH dated September 27, 2013 (License No. L3894); the License Agreement between the Debtor and RTL Television GmbH dated September 27, 2013 (License No. L3895); the License Agreement between the Debtor and Sparrow Hawk International Channels Ltd. dated August 20, 2013; the License Agreement between the Debtor and Ureteam Medya H/ZMETLER/A.S. dated July 4, 2013; and the License Agreement between the Debtor and Zed dated August 18, 2013.

## ARTICLE IX.

## CONDITIONS TO CONFIRMATION

The following are conditions precedent to Confirmation of the Plan:

(1)     the Confirmation Order shall have been entered and become a Final Order; and

(2)     all actions, documents and agreements necessary to implement the Plan shall have been effected or executed, including the execution by the Bank of Exhibit "A" attached hereto.

31

## ARTICLE X.

## **RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction to: (a) allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim or Interest, including, without limitation, the resolution of any Proof of Administrative Claim, and the resolution of any and all objections to the allowance or priority of Claims or Interests; (b) grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for any period ending on or before the Effective Date; (c) resolve any motions or matters pending on the Effective Date regarding assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which the Trustee or any Debtor is a party or with respect to which the Trustee or any Debtor may be liable and to hear, determine and if necessary, liquidate any and all Claims arising therefrom; (d) decide or otherwise resolve any and all matters under section 505 of the Bankruptcy Code with respect to any tax, fine, penalty or addition to tax; (e) resolve any questions and disputes regarding title to the assets of the Debtor; (f) ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan; (g) decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor or the Estate that may be pending on the Effective Date; (h) enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or Disclosure Statement or to enforce all orders, judgments, injunctions and rulings entered in connection with the Chapter 11 Cases; (i) resolve any and all

32

controversies, suits or issues that may arise in connection with the consummation, interpretations or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan; (j) modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, or to modify the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement; (k) remedy any defect or omission or reconcile ay inconsistency in an Order, the Plan, the Disclosure Statement, the Global Stipulation, the Agreement of Sale, the Repair Escrow Agreement or any other contract, instrument, release or other agreement or document created in connection with the Plan, to the extent authorized herein or in the Bankruptcy Code; (l) issue any injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by an Entity with consummation of enforcement of the Plan; (m) enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, revered, revoked or vacated; (n) determine any dispute arising under or related to the Plan, including, without limitation, any dispute concerning the scope or effect of any release, injunction or discharge provided for by the Plan or the Confirmation Order; and (o) enter a Final Decree.

## ARTICLE XI.

### RELEASES AND INJUNCTION

A.    *Injunction*

Except (i) as otherwise provided in the Plan or (ii) as otherwise provided under Final Order entered by the Bankruptcy Court, the entry of the Confirmation Order shall forever stay, restrain and permanently enjoin (i) the commencement or continuation of any action, the employment of process or any act to collect, enforce, attach, recover or offset from the Debtor or from property of the Debtor, (ii) the creation, perfection or enforcement of any lien or

encumbrance against any property of the Debtor or any property distributed under the Plan, or (iii) any Claim or Interest discharged, released or satisfied under the Confirmation Order, the Plan or pursuant to section 1141(d)(1) of the Bankruptcy Code.

B.    *Limitation of Liability*

Except with respect to conduct after the Effective Date, neither the Debtor, nor any of its employees (acting in such capacity) nor any professional person employed by it, shall have incurred or will incur any liability to any Entity for any action taken or omitted to be taken in connection with or related to the formation, preparation, dissemination or Confirmation of the Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with Chapter 11 Case or the Plan, except in the case of willful misconduct – fraud, gross negligence or legal malpractice.

C.    *No Release of Plan Obligations*

Nothing in this Article XI shall operate to release any Person from the obligations expressly contemplated by this Plan.

D.    *Plan and Confirmation Order as Release*

From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute and may be submitted as a complete defense to any claim or liability released pursuant to this Article XI of the Plan.

## ARTICLE XII.

## EXCULPATION

Except with respect to conduct after the Effective Date, each retained Professional of the Debtor or the Committee, and each member of the Committee, is hereby exculpated by all

34

persons, Holders of Claims, entities, and parties-in-interest receiving distributions under the Plan, from any and all causes of action, liabilities or claims of any sort arising on or after the Petition Date out of or in connection with (a) the case or (b) the discharge of the powers and duties conferred upon such person by the Plan, or by any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan or applicable law, except solely for actions or omissions arising out of their respective gross negligence or willful misconduct – fraud and legal malpractice. Holders of Claims, or representative thereof, shall not pursue any Claim, liability or cause of action (a) against the Plan Administrator for making payments in accordance with the Plan, or for implementing the provisions of the Plan, or (b) against any Holder of a Claim for receiving or retaining distributions or other payments as provided for in the Plan.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

A.    *Termination of Cash Collateral Order Requirements*

As of November 10, 2013, the Debtor will no longer be required to make commission payments to any Counterparty provided for in the Cash Collateral Orders. Thereafter, payments will be made by the Plan Administrator in accordance with the Plan.

B.    *Dissolution and Discharge of the Committee*

Upon the Effective Date, the Committee will be deemed to be dissolved and discharged from its duties.

C.    *Compliance with Tax Requirements*

In connection with the Plan, the Debtor shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities with respect to the Distributions; provided, however, that the transfer of any Cash, property or other interest

hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

D.    *Due Authorization by Creditors*

Each and every Creditor who elects to participate in the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding liens, encumbrances, commitments, agreements or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

E.    *Amendments*

The Plan may be altered, amended or modified by the Debtor, in writing, at any time before the substantial consummation of the Plan, as provided in sections 1101 (a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

F.    *Revocation*

The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any interests in, the Debtor; or (ii) prejudice in any manner the rights of the Debtor in any further proceedings involving the Debtor.

G.    *Filing of Additional Documents*

Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

36

H.   *Counterparty's Limited Right to Investigate*

On and after the Effective Date, a Counterparty shall retain rights, pursuant to Bankruptcy Rule 2004, to investigate and analyze the Debtor's books and records relating to payments that had been made and/or are due and owing under any license agreements executed by the Debtor pursuant to the Distribution Agreement with the Counterparty.

I.   *Section Headings*

The section headings contained in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

J.   *Computation of Time*

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

K.   *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor assign of such Entity.

L.   *Severability*

If any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or enforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose and intent of the term or provision held to be invalid, void or unenforceable, and such term or provisions shall then be applicable as altered or interpreted, unless the consequence of doing so shall materially adversely alter the rights or obligations of the Person affected by any such change, in which event the consent of such Person shall be required in order to confirm the Plan. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms

37

and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial interpretation and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms, provided that consents, if any, required by the first sentence of this Article XII shall have been obtained.

M.    *Governing Law*

Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, and subject to the provisions of any contract, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Connecticut without giving effect to the principles of conflict of laws thereof.

N.    *Time*

In computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.

O.    *No Admissions*

Notwithstanding anything herein to the contrary, nothing contained in this Plan or the Disclosure Statement shall be deemed to be an admission by the Proponent with respect to any matter set forth herein, including any liability on or treatment of any Claim.

O.    *Notices*

All notices and requests in connection with the Plan shall be in writing and shall be hand delivered or sent by mail to:

38

Pullman & Comley, LLC
850 Main Street
Bridgeport, Connecticut 0660
Attn:  Elizabeth J. Austin, Esq.
*Attorney for the Debtor*

Zeisler & Zeisler
10 Middle Street
Bridgeport, Connecticut 06604
Attn.:  Craig Lifland, Esq.
*Attorney for the Committee*

*Plan Administrators:*
Gary Lico
Cable Ready Corp.
98 East Avenue
Norwalk, CT  06851

David Fox
David Fox & Associates
838 West End Avenue 8C
New York, NY  10025

P.     *Debtor's Request to Confirm Plan*

The Debtor's requests that the Court enter an order confirming the Plan.

Dated at Bridgeport, Connecticut this 18th day of December, 2013.

CABLE READY CORPORATION

By: /s/  Gary Lico _____
        Gary Lico, Its President


PULLMAN & COMLEY, LLC

By:  */s/Elizabeth J. Austin* _____
        Elizabeth J. Austin (ct04384)
        Jessica Grossarth (ct23975
        Pullman & Comley, LLC
        850 Main Street
        Bridgeport, CT  06604
        (203) 330-2243
        eaustin@pullcom.com
        jgrossarth@pullcom.com
        *Counsel to Cable Ready Corporation*

ACTIVE/76109.4/JXG/4350171v4

39